Filed 6/14/22  P. v. Williams CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>AHKEEM DEISHAVAR WILLIAMS,<br><br>    Defendant and Appellant. | F081466<br><br>(Super. Ct. No. 19CMS2060)<br><br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kings County.  Steven D. Barnes, Judge.

Jared G. Coleman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Stephanie A. Mitchell, Kari Ricci Mueller and Eric L. Christoffersen, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]        Before Hill, P. J., Levy, J. and Smith, J.

Defendant Ahkeem Deishavar Williams pled guilty to the charge of making criminal threats and admitted a prior "strike" conviction within the meaning of the "Three Strikes" law (Pen. Code, §§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).[1]  On appeal, defendant contends that (1) his trial counsel was ineffective for failing to correctly inform him of the limitations on his custody credit earning potential caused by admission of a prior strike conviction, (2) his substitute counsel was ineffective in failing to file a motion to withdraw defendant's guilty plea, and (3) his sentence must be vacated and his case remanded for resentencing in light of Senate Bill No. 567's (2021–2022 Reg. Sess.) (Senate Bill 567) amendments to section 1170, subdivision (b).  The People disagree on all accounts.  We vacate defendant's sentence and remand for further proceedings pursuant to section 1170, subdivision (b).

## PROCEDURAL SUMMARY

On May 28, 2019, the Kings County District Attorney filed an information, charging defendant with making criminal threats (§ 422, subd. (a); count 1), misdemeanor resisting a peace officer (§ 148, subd. (a)(1); count 2), and misdemeanor trespassing (§ 602, subd. (q); count 3).  As to count 1, the information further alleged that defendant had suffered a prior strike conviction (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) which also qualified as a serious felony conviction (§ 667, subd. (a)(1)), and had served a prior prison term (§ 667.5, former subd. (b)).

On August 26, 2019, defendant filed a motion to set aside all counts of the information (§ 995).  On September 9, 2019, the trial court granted defendant's motion as to counts 2 and 3, but denied the motion as to count 1.

On October 25, 2019, the trial court held a change of plea hearing.  Before changing his plea, defendant inquired regarding his prison custody credit earning capacity.  The trial court told defendant that his custody credits were determined by the

[1]  All further statutory references are to the Penal Code.

State Department of Corrections and Rehabilitation (CDCR). Then, pursuant to a negotiated plea agreement, defendant pled guilty to count 1 and admitted the prior strike conviction allegation. The plea agreement required imposition of a six-year term of imprisonment and dismissal of the prior serious felony conviction and prior prison term allegations on the People's motion.

On November 25, 2019, defendant's trial counsel advised the court that his client sought to withdraw his plea. The matter was set over to afford defendant's counsel an opportunity to discuss the matter with defendant.

On January 6, 2020, defendant moved, and the trial court granted defendant's *Marsden*[2] motion for substitute counsel for purposes of filing a motion to withdraw from the plea agreement on the basis that his trial counsel misadvised him regarding credit earning capacity.

On April 8, 2020, defendant's substitute counsel told the court that, after his review of the record and interview of defendant's former counsel, there was no basis to file a motion to withdraw the plea. The trial court set the matter over for defendant's substitute counsel to obtain a declaration from defendant's former counsel regarding what was discussed regarding defendant's prison custody credit earning capacity.

On June 5, 2020, after having obtained and reviewed the record and defendant's former counsel's declaration, defendant's substitute counsel declined to file a motion to withdraw from the plea on defendant's behalf. The trial court then conducted another *Marsden* hearing at which it determined that new substitute counsel would not be appointed because defendant knowingly and voluntarily entered his guilty plea and there was no basis to withdraw the plea.

On the same date, the trial court sentenced defendant to six years (the upper term of three years doubled due to the prior strike conviction) in prison on count 1 pursuant to

---

[2]     *People v. Marsden* (1970) 2 Cal.3d 118.

the plea agreement. The trial court did not state its reasons for imposition of the upper term.

On June 17, 2020, defendant filed a notice of appeal.

## FACTUAL SUMMARY

The trial court recited, and defendant admitted, the following factual basis:

"[On May 6, 2019,] … you did threaten to commit a crime which could result in death, or great bodily injury to a person whose initials [are] RS and when that happened you intended the statement you made to be taken as a threat and the threat was unequivocal, unconditional and that the person was in sustained fear of their safety and the safety of their family."

Beyond that admitted factual basis, at the preliminary hearing, the following was presented:

Ronald Stover worked as a Kings County Public Defender. In May 2019, he had known defendant for about three years and had represented him "on a number of different occasions." On May 6, 2019, Stover met with defendant outside of his assigned courtroom immediately before the morning or afternoon calendar. Defendant demanded that Stover provide him with some videos from closed and dismissed cases that Stover had previously provided to him on a CD. Defendant said the CD was not working. Stover offered to share the video file with defendant digitally and requested his email address. Defendant "became very aggressive" and approached Stover, demanding that Stover go to his office immediately and give defendant what he wanted. Stover described that defendant was loud, cursed at him, clenched his fists, pushed his chest out at Stover while moving toward him, and refused Stover's multiple requests that he step back. Stover was concerned for his safety because he had seen defendant "become extremely violent and aggressive with others."

After pursuing Stover around the perimeter of the "support wall" outside the courtroom, defendant backed Stover against a glass window. He continued to refuse Stover's requests to back away. He told Stover that he was going to "take [him] outside

4.

and get what he wanted." Stover thought defendant might strike him or push him toward the glass window. At around that time, the bailiff for Stover's assigned courtroom opened the door to the courtroom and observed defendant's conduct toward Stover. He asked defendant to step back, and defendant again refused to do so. Soon after, five or six deputies approached defendant and moved him about 10 feet from Stover. Less than a minute later, defendant rushed toward Stover and was stopped by the deputies and handcuffed. He was then removed from the hallway outside the courtroom and transported to jail.

## DISCUSSION

### I. Due Process and Ineffective Assistance of Counsel: Advisement Regarding Custody Credits

Defendant argues that the trial court violated his due process rights by misadvising him regarding his eligibility for custody credits and his trial counsel was ineffective for failing to advise him that he was ineligible under the plea agreement to earn custody credits amounting to 50 percent of his sentence. As the parties agree, based on admission of a prior strike conviction, defendant could not earn credits in excess of 20 percent of his total sentence. (§ 667, subd. (c)(5).) The People nevertheless argue that defendant's due process and ineffective assistance of counsel claims fail because he suffered no prejudice. We agree with the People.

#### A. Additional Background

On October 25, 2019, the parties advised the court that they had reached a resolution. They submitted a signed plea agreement wherein defendant pled guilty to count 1—which was described as an offense carrying an exposure of 16 months, two years, or three years—and admitted a prior strike conviction for a total term of imprisonment of six years. Prior to the trial court taking defendant's plea, the trial court advised defendant that by the terms of the agreement he would be sentenced to six years

in state prison and asked if that was defendant's understanding. The following discussion then occurred:

> "[] DEFENDANT: Yes. But I'm trying to get an understanding of the time. The time. He tells—
>
> "THE COURT: Six years.
>
> "[DEFENDANT'S COUNSEL]: I explained to my client it is six years. I think what my client is asking, Judge, he wants to inquire as to how much actual time he's going to spend and I told him that's not up to the Court.
>
> "THE COURT: What you're really asking is what the credits are going to be. Going to do 50 percent or 80, that's the question, right?
>
> "[] DEFENDANT: Yes, basically.
>
> "THE COURT: I can't answer that for you. It's not up to me. I don't make that determination. The reason is many fold. Most important reason is it really depends upon your conduct after you get to prison. Because that—your credits can change. They can take credits away depending on your behavior, et cetera, et cetera. When you get there you will go to one location first and be there a few months and they will set you up, give you your release date and times. And I don't mean this in offensive way but you've been in prison before, right?
>
> "[] DEFENDANT: Yes.
>
> "THE COURT: You know how it works, right?
>
> "[] DEFENDANT: Yeah.
>
> "THE COURT: They will give you an outdate.
>
> "[] DEFENDANT: What I'm saying is you don't basically have to stipulate it's six years with half? It's prison that stipulates that?
>
> "THE COURT: I don't determine it's six years at half. I determine it's six years based on the agreement been reached [*sic*]. Okay. How much of that you actually do is up to the department of corrections, not me."

At the January 6, 2020, *Marsden* hearing, defendant repeatedly stated that his trial counsel led him to believe that, under the plea agreement, he "was taking a deal for

6.

six with half"—meaning a six year term of imprisonment with 50 percent credit earning capacity. Defendant's trial counsel did not respond directly to defendant's assertion. Instead, he relayed that defendant asked him "to clarify exactly how much time [defendant would serve], and [inquired whether] the judge knows [the answer]. [Defendant's counsel] said no,[3] but [told defendant that he] could ask [the judge]." Likewise, in defendant's trial counsel's later declaration, he relayed only the events that occurred at the change of plea hearing and did not directly address whether he had advised defendant regarding any limits on custody credits.

### B. Due Process

A defendant must be advised of direct consequences of a plea in order for the plea to be knowingly and voluntarily entered. (*People v. Barella* (1999) 20 Cal.4th 261, 266 (*Barella*).) Limitations on a defendant's credit earning capacity in prison due to a prior strike conviction is a collateral consequence, not a direct consequence, of a guilty plea of which a trial court need not advise a defendant in order for a defendant's guilty plea to be knowing and voluntary. (*Id.* at pp. 270–271.) However, the trial court also has an obligation not to *misadvise* a defendant regarding the consequences of a plea agreement, including credit earning capacity. (*People v. Goodwillie* (2007) 147 Cal.App.4th 695, 733–735 (*Goodwillie*) ["[T]he court and the prosecutor, as officers of the court, have a duty not to misstate the law, whether intentionally or not."].)

When a trial court misadvises a defendant, prejudice must still be demonstrated— that he would not have accepted the plea agreement if he had been correctly advised. (*People v. Miralrio* (2008) 167 Cal.App.4th 448, 462–463; see *In re Moser* (1993) 6

---

**3** It is not clear to us from the context whether defendant's trial counsel meant that he did not know how much time defendant would serve or that the trial judge would not know.

7.

Cal.4th 342, 352.)[4] Where a defendant accepts a plea agreement based on misinformation, prejudice is demonstrated if defendant would not have accepted the plea agreement if he had not been misadvised. Relevant to that inquiry are (1) whether the misinformation provided by the court made the plea bargain more attractive than it would have been if defendant was not misadvised (*Goodwillie*, *supra*, 147 Cal.App.4th at p. 734) and (2) the likely outcome if defendant had gone to trial (see *Hill v. Lockhart* (1985) 474 U.S. 52, 59–60 (*Hill*) [in determining prejudice in the ineffective assistance of counsel context, courts should consider whether a defendant was likely to have been convicted of the charged offenses, and if so, whether he would have received a shorter sentence than he received pursuant to the plea agreement]). "[P]redictions of the outcome at a possible trial [and whether a defendant would have gone to trial] … should be made objectively, without regard for the 'idiosyncrasies of the particular decisionmaker.' " (*Hill*, *supra*, 474 U.S. at pp. 59–60, citing *Evans v. Meyer* (1984) 742 F.2d 371, 375 ["It is inconceivable to us … that [the defendant] would have gone to trial on a defense of intoxication, or that if he had done so he either would have been acquitted or, if convicted, would nevertheless have been given a shorter sentence than he actually received."].)

---

[4] The *Miralrio* court disagreed with the *Goodwillie* court on the issue of prejudice. Where *Goodwillie* appeared to place the "burden … *on the People* to prove the error harmless beyond a reasonable doubt" *Miralrio* concluded that the burden should appropriately be placed on the defendant, as is the case for ineffective assistance of counsel, for three reasons: (1) because " '[a]nyone who seeks on appeal to predicate a reversal of conviction on error must show that it was prejudicial' " (*Miralrio*, *supra*, 167 Cal.App.4th at p. 642); (2) "it makes sense to require the defendant to show prejudice, because the defendant is the only one who knows whether he would have accepted the plea bargain absent the misadvisement" (*Id.* at p. 643); and (3) because "[i]t would be anomalous to place the burden on the defendant in ineffective-counsel cases but on the People in other cases of misadvisement" (*Ibid.*). We agree with the *Miralrio* court for the reasons it articulated.

In *Goodwillie,* the prosecutor and trial court misadvised the pro se defendant that he would serve at least 85 percent of the sentence and was not eligible to serve 50 percent of the sentence due to his prior strike conviction. (*Goodwillie*, *supra*, 147 Cal.App.4th at p. 731.) Based on the misinformation, the defendant refused the plea agreement and went to trial. (*Id.* at p. 732.) After his conviction, the trial court informed him that he was eligible to earn custody credits up to 50 percent of his total sentence. (*Ibid.*) On appeal, the court determined that the trial court violated defendant's due process rights; "[b]y misinforming Goodwillie as to the consequences of the proffered plea bargain, the court … caused him to reject an offer that was more favorable to him than the result after trial, and one that he had indicated a willingness to accept." (*Id.* at p. 735.)

The People attempt to distinguish from *Goodwillie* by arguing that, in the present case, the trial court did not *misadvise* defendant. Instead, they argue, "[a]t most, [the trial court] failed to tell appellant that he was limited to earning 20 percent credits while serving his sentence." We disagree with the People's characterization. (*Cf. Barella*, *supra*, 20 Cal.4th at p. 264 [no constitutional violation where the trial court made no mention of credit earning limits].) The trial court did not merely fail or refuse to answer defendant's question. It informed defendant that it "could not" answer the question and did not "make that determination," suggesting that only the CDRC could answer the question. The court's statement was not a refusal or failure to inform—for instance, I do not know your credit earning eligibility—it was incorrect information—no one but the CDRC could know. Defendant accepted the plea agreement after the trial court advised him, in essence, that whether he was eligible to earn 50 percent credit or 20 percent credit was unknowable. In fact, based on the plea agreement, defendant was ineligible to earn more than 20 percent credit based on his admission of a prior strike conviction.

Next, we must consider whether defendant was prejudiced by the misinformation. Before pleading guilty, defendant asked how much time he would serve under the plea agreement and agreed with the court's framing of the question: "What you're really

9.

asking is what the credits are going to be. Going to do 50 percent or 80, that's the question, right?" At the next hearing, after defendant had learned that he was misadvised, he immediately sought to withdraw from the plea agreement. When defendant was given an opportunity to explain why he sought to withdraw from the plea agreement, he repeatedly explained that he thought he was eligible to earn custody credits for up to 50 percent of the total sentence. Before and after the plea, defendant expressed disinterest in a plea agreement that required him to serve at least 80 percent of his sentence. Defendant's goal, as he explained on June 5, 2020, was to "get [the least] time as possible …."

However, defendant's dissatisfaction with the plea agreement, by itself, is not sufficient to demonstrate prejudice if there was no possibility that defendant could have achieved a better outcome had he not accepted the plea. Here, defendant could not have obtained a more favorable outcome if he had not pled guilty. Defendant faced a maximum term of 11 years imprisonment.[5] Pursuant to the plea agreement, the five-year prior serious felony enhancement (§ 667, subd. (a)) was dismissed.

Defendant's alternative—going to trial—would not have resulted in a better outcome. Defendant explained that he believed he had a viable defense because his conduct did not rise to the level of felony criminal threats. Specifically, "he 'did not threaten anybody' with death or great bodily harm as required under section 422." The record before us does not support defendant's contention. Based on the testimony from the preliminary hearing, defendant pursued Stover with clenched fists, got very close to him, refused Stover's requests that he move away, verbally *told* Stover that he was going

---

[5]     Defendant also faced imposition of three prior prison term enhancements pursuant to section 667.5, former subdivision (b). Because those prior prison terms were not served for sexually violent offenses, those enhancements are no longer applicable, and we do not consider them in calculating defendant's potential maximum term of imprisonment.

to "take [him] outside and get what he wanted," and attempted to rush at Stover even after deputies moved defendant away from Stover. Stover knew defendant to be violent based on prior interactions. Those circumstances are sufficient to support a conviction for felony criminal threats. (E.g. *People v. Martinez* (1997) 53 Cal.App.4th 1212, 1218, 1220 [the defendant's statements to victim, including " 'I'm going to get you,' " and " 'I'll get you,' " were sufficient to convey a felony criminal threat where the defendant also approached the victim "quickly, … yelled and cursed at him, … got within very close proximity to his face, and … displayed very angry behavior"].) Nothing in the record suggests any other factual scenario. Moreover, the record gives no indication that defendant would have been able to successfully challenge the existence of his prior strike conviction.

Despite defendant's apparent unwillingness to accept a plea agreement that required him to serve at least 80 percent of the sentence, defendant had no more favorable alternative available. He accepted a plea agreement that allowed him to serve roughly half of what he could have been sentenced to if he had been convicted at trial. On the record before us, it is not clear that a rational defendant would have rejected the plea agreement had he not been misinformed that only the CDRC could determine limits on capacity to earn custody credits. For that reason, we conclude that defendant suffered no prejudice.

### C. Ineffective Assistance of Counsel

To establish ineffective assistance of counsel defendant must show (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216–217.) " 'Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy."

11.

[Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." ' " (*People v. Lopez* (2008) 42 Cal.4th 960, 966.) To establish prejudice, defendant must make a showing "sufficient to undermine confidence in the outcome" that but for counsel's errors there is a reasonable probability that the result of the proceeding would have been different. (*Strickland*, at p. 694; *Ledesma*, at pp. 217–218.) Specific to the context of an accepted plea agreement, to establish prejudice "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." (*Hill*, *supra*, 474 U.S. at p. 59.)

While a defense lawyer is required to advise a defendant of the direct consequences of his or her plea, "a defense lawyer's ' "failure to advise the defendant of the collateral consequences of a guilty plea cannot rise to the level of constitutionally ineffective assistance." ' " (*People v. Reed* (1998) 62 Cal.App.4th 593, 597.) "[T]here exists no federal requirement, constitutional or otherwise, that a defendant be admonished *by the trial court* about parole eligibility factors as a condition of a valid guilty plea." (*Id*. at p. 598.) Nevertheless, as the parties agree, defense counsel has an obligation not to *affirmatively misadvise* his or her client regarding the collateral consequences of a guilty plea, including any limit on credit earning capacity. (See *People v. Kim* (2009) 45 Cal.4th 1078, 1104 ["an attorney has a constitutional duty at least not to affirmatively *misadvise* his or her client as to the immigration consequences of a plea"].)

For a defendant to prevail on appeal on an ineffective assistance of counsel claim alleging he was misadvised by trial counsel as to a collateral consequence of the plea, "the record on appeal [must] definitively establish whether or not counsel so advised defendant (beyond defendant's bare assertion …)" and whether defendant would "not have entered into the apparently favorable plea agreement" had he not been misadvised.

12.

(*Barella*, *supra*, 20 Cal.4th at p. 272.) If those facts are not established by the record, a "defendant's claim of ineffective assistance of counsel should be resolved in a habeas corpus proceeding rather than on appeal." (*Ibid*.)

In *Barella*, the defendant entered a plea agreement by which he pled guilty to an offense and admitted a prior strike conviction in exchange for dismissal of a charged offense. (*Barella*, *supra*, 20 Cal.4th at p. 263.) Before sentencing, the defendant moved to withdraw his plea, contending that he had been unaware that he would not earn more than 20 percent custody credit due to his prior strike. (*Id*. at p. 264.) He declared that he was not advised that he would "have to serve 80 percent of any sentence imposed. It was [his] understanding [that he] would receive 50 percent credit for good time and work time …." (*Ibid*.) He further alleged that if he had known about the limit on credit earning capacity, he would not have entered his plea. (*Ibid*.) The Supreme Court concluded that the record did not definitively establish the facts necessary to support an ineffective assistance of counsel claim on appeal. (*Id*. at p. 271.)

Here, the record does not definitively establish that defendant's trial counsel erroneously advised him that he could earn 50 percent custody credit. As was the case in *Barella*, the only evidence in the record suggesting that trial counsel was ineffective is defendant's bare assertion that he was misadvised. (*Barella*, *supra*, 20 Cal.4th at p. 270.) Counsel's failure to advise defendant of credit earning limitations due to a prior strike conviction—as opposed to affirmative misrepresentation of the consequences—is not sufficient to state a claim for ineffective assistance of counsel. (*People v. Kim*, *supra*, 45 Cal.4th at p. 1104.) The record does not clearly demonstrate that defendant's trial counsel's performance was deficient.

Moreover, prior to taking his plea, the trial court told defendant that it could not determine his credit earning capacity in prison; it told defendant that the CDRC made the decision. While the trial court was partially mistaken—it could certainly have told defendant that because of his strike conviction he would have to serve at least 80 percent

13.

of his sentence—that defendant nevertheless entered a guilty plea under the belief that only the CDRC could calculate his credit earning capacity belies his contention that he only pled guilty because he was advised that he would only serve 50 percent of the statutory sentence.  His argument that he suffered prejudice—because he would not have pled guilty if he had not been misadvised by his counsel that he could earn 50 percent credit—is therefore unsupported by the record.  Defendant pled guilty after the trial court explicitly told him that the plea agreement did not determine any limitations on his credit earning capacity.

Further, as discussed in the previous section, there is no reasonable likelihood that defendant could have obtained a better outcome if he had gone to trial.  (*Hill*, *supra*, 474 U.S. at pp. 59–60.)  The record before us does not demonstrate that defendant suffered any prejudice.

## II.  Ineffective Assistance of Counsel:  Withdrawal of Guilty Plea

Defendant next argues that trial counsel and substitute counsel were ineffective for failing to file a motion to withdraw his guilty plea.  The People again disagree, as do we.

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  …  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  (*Strickland*, *supra*, 466 U.S. at p. 697.)

As we described above, defendant could not have achieved a better outcome in this case even if he had been permitted to withdraw his guilty plea.  His ineffective assistance of counsel claim fails for lack of prejudice.

## III.  Senate Bill 567

Finally, defendant contends that we must vacate the sentence and remand the matter because defendant did not admit, and the trial court did not find, that circumstances in aggravation of the offense justified a sentence exceeding the

14.

middle term. The People respond that the modifications to section 1170 brought about by Senate Bill 567 are inapplicable in this case because the trial court had no discretion to impose a sentence other than the sentence set out in the negotiated plea agreement. The People are mistaken.

Effective January 1, 2022, Senate Bill 567 amended section 1170, subdivision (b)(2), such that it now provides, "[t]he court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).)[6] On the other hand, section 1192.5, subdivision (b), provides in relevant part, that when a "plea is accepted by the prosecuting attorney in open court and is approved by the court, … the court may not proceed as to the plea other than as specified in the plea."

### A. Retroactivity

As a threshold matter, Senate Bill 567 is retroactive to cases not yet final on appeal pursuant to *In re Estrada* (1965) 63 Cal.2d 740 (see *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038–1039 [remanding for resentencing under another ameliorative amendment to section 1170 by Senate Bill 567]) and defendant's sentence is not yet final on appeal.

### B. Section 1170, subdivision (b)(1), (2), and Section 1192.5

The People contend that section 1170, subdivision (b)(2), applies only when the trial court's discretion is not restrained by a negotiated plea agreement pursuant to section 1192.5. They reason that when a plea agreement stipulates that the upper term be

---

[6]     A trial court is permitted to rely upon a certified record of conviction to determine prior criminality for purposes of sentencing without submitting the prior conviction to a jury. (§ 1170, subd. (b)(3).)

imposed, the trial court exercises no discretion and may not make the finding required by section 1170, subdivision (b)(2). For that proposition, the People rely on *People v. Brooks* (2020) 58 Cal.App.5th 1099 (*Brooks*). In *Brooks*, the defendant entered a plea agreement that stipulated a 13-year sentence. (*Id*. at p. 1102.) Brooks petitioned the lower court to be resentenced, pursuant to recently enacted section 1170.91, subdivisions (a) and (b)(1), which, collectively, required the trial court to consider specific mental health problems as circumstances in mitigation when sentencing military veterans and permitted military veterans with such problems to petition for a recall of sentence. (*Brooks*, at pp. 1102–1103; § 1170.91, subds. (a) & (b)(1); see § 1170.91 ["court shall consider the [identified] circumstance as a factor in mitigation when imposing a term under subdivision (b) of Section 1170"].) The trial court concluded that it had no power to resentence defendant because his plea agreement provided for a stipulated term. (*Brooks*, at p. 1103.) The trial court affirmed, concluding that section 1170.91 does not "extend[] to sentences based on final convictions by plea agreement specifying a stipulated imprisonment term." (*Ibid*. at p. 1106.) The court explained that there was no "triad sentencing discretion to exercise" because the plea agreement specified the sentence to be imposed and, pursuant to section 1192.5, no other sentence could properly be imposed. (*Brooks*, at p. 1107.)

The *Brooks* court distinguished the case from *People v. Stamps* (2020) 9 Cal.5th 685 (*Stamps*), where the court was required to apply a retroactive ameliorative change in the law that provided new discretion to dismiss an enhancement (see § 1385). (*Brooks*, *supra*, 58 Cal.App.5th at p. 1107.) In *Brooks,* however, section 1170.91 did not "grant the trial court unfettered discretion to reconsider an aspect of his sentence that would in turn affect his plea bargain. All it [did was] allow a court to take certain mitigating factors into account and only insofar as the court is otherwise permitted to exercise discretion in the selection of a low, middle, or high term from within the applicable sentencing triad." (*Brooks*, at p. 1107.)

*Brooks* is not controlling here.  Section 1170.91 does not parallel section 1170, subdivision (b)(1) and (2).  The amendment to section 1170, subdivision (b)(2), does not merely require the trial court to consider additional factors in reaching a trifecta determination; it *precludes* the trial court from imposing the upper term unless it finds "there are circumstances in aggravation of the crime that justify the imposition of" the upper term.  Indeed, section 1170, subdivision (b)(1), requires such a finding any time "the statute specifies three possible terms."  In other words, section 1170, subdivision (b)(1) and (2) mandates a new finding; it does not simply add an additional consideration to an already existing determination.  Section 1170, subdivision (b)(1) and (2) require trial courts to determine whether the circumstances in aggravation of the crime justify the imposition of a term of imprisonment exceeding the middle term.  While the parties may stipulate to the existence of facts that support such a determination, they cannot, by negotiated plea agreement, obviate the need for the trial court to make the required determination.

### C.  *Remedy*

Because defendant's case is not yet final on appeal and the trial court did not make the determination required under section 1170, subdivision (b)(1), we must determine the appropriate remedy.  For the following reasons, we conclude that we must remand the matter to permit the trial court to make the required determination.  If the trial court does not conclude that there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, it cannot impose the upper term.  We are cognizant that under the terms of the plea agreement, no term other than the upper term may be imposed.  The only remedy left in that situation is for the trial court to withdraw approval for the plea agreement and return the parties to the status quo ante.

In *People v. Flores* (2022) 77 Cal.App.5th 420 (*Flores*), this court discussed the appropriate remedy when an ameliorative change in law undermines a plea agreement by

requiring imposition of a sentence other than the sentence required by a negotiated plea agreement. Specifically, Assembly Bill No. 1950 (2019–2020 Reg. Sess.) (Assembly Bill 1950), as applicable to *Flores*, required that misdemeanor terms of probation not exceed one year but the negotiated plea agreement required that defendant be granted a three-year term of misdemeanor probation. (*Flores*, at pp. 1−2.) Assembly Bill 1950 was undisputedly retroactive pursuant to *Estrada.* However, we explained that "[a]s stated in *Stamps*, [ *supra*, 9 Cal.5th 685], '[t]he *Estrada* rule only answers the question of *whether* an amended statute should be applied retroactively. It does not answer the question of *how* that statute should be applied.' " (*Flores*, at p. 7.) How the statute should be applied is a question of legislative intent. (*Ibid.*)

In *Flores*, we outlined basic principles of plea bargaining and our Supreme Court's decisions in *People v. Collins* (1978) 21 Cal.3d 208 (*Collins*), *Harris v. Superior Court* (2016) 1 Cal.5th 984 (*Harris*), and *Stamps*, *supra*, 9 Cal.5th 685. We distilled the following principles relevant to this matter. First, a defendant sentenced pursuant to a negotiated plea agreement is not excluded from the benefits of ameliorative changes in the law (*Flores*, *supra*, 77 Cal.App.5th at pp. 14−15, citing *Harris*, *supra*, at p. 991); however, in applying an ameliorative change in the law, " 'the court is not authorized to unilaterally modify the plea agreement by striking [portions of the sentence] but otherwise keeping the remainder of the bargain[,]' " absent legislative intent to the contrary (*Flores*, at p. 23, quoting *Stamps*, at p. 707). Second, when external events, such as an ameliorative change in the law undermine a plea agreement, the court " 'must fashion a remedy that restores to the state the benefits for which it bargained *without depriving* [*the*] *defendant of the bargain to which he remains entitled.*' " (*Flores*, at p. 12, quoting *Collins*, at p. 216.) Third, in fashioning a remedy where the plea is undermined by an ameliorative change in law (as opposed to an ameliorative change in the law merely granting the trial court additional discretion), the defendant may not be

18.

subjected "to more severe punishment than under the plea agreement." (*Flores*, at pp. 14, 38−39, citing *Harris*, at pp. 989–990.)

As we highlighted in *Flores*, the appropriate remedy when an ameliorative change of law impacts a stipulated sentence imposed pursuant to a negotiated plea agreement can take many different forms as demanded by the text and intent of the legislation at issue and the need to maintain the reciprocal benefits imparted by the plea agreements. In *Collins*, the defendant pled guilty to an offense in exchange for dismissal of 14 other counts. (*Collins*, *supra*, 21 Cal.3d at p. 211.) The defendant's crime of conviction was decriminalized but the defendant was nevertheless sentenced pursuant to the plea agreement. (*Id.* at pp. 211–212.) Our Supreme Court concluded that the proper remedy was permitting revival of one or more of the 14 counts dismissed pursuant to the plea agreement "but limiting [the] defendant's potential sentence …[,]" not to exceed the sentence originally imposed. (*Collins*, *supra*, 21 Cal.3d at p. 216; *Flores*, *supra*, 77 Cal.App.5th at p. 12.)

In *Harris*, the ameliorative change in law (Proposition 47) modified the offense to which defendant pled guilty pursuant to a plea agreement from a felony to a misdemeanor but left unaffected the felony charges dismissed pursuant to the plea agreement. (*Harris*, *supra*, 1 Cal.5th at p. 988; *Flores*, *supra*, 77 Cal.App.5th at p. 13.) The legislation explicitly applied to plea agreements, was intended to reduce the number of nonviolent offenders in state prison, and provided a specific " 'safety valve' "—permitting courts to decline relief if it " 'would pose an unreasonable risk of danger to public safety.' " (*Harris*, at pp. 991–992; *Flores*, at p. 15.) The *Harris* court therefore found that the intent of the electorate was to allow modification of plea agreements without affording the People an opportunity to withdraw from the plea agreement; to do otherwise would frustrate the intent of the electorate. (*Harris*, at p. 992; *Flores*, at pp. 16−17.)

In *Stamps*, the defendant was sentenced pursuant to a negotiated plea agreement to a stipulated nine-year term, five years of which were imposed for a then-mandatory

19.

enhancement.  (*Stamps, supra*, 9 Cal.5th at p. 692; *Flores, supra*, 77 Cal.App.5th at pp. 17−18.)  While the matter was pending on appeal, the ameliorative change in law (Senate Bill No. 1393 (2017–2018 Reg. Sess.)) granted the court discretion to strike the five-year enhancement.  (*Stamps*, at p. 692; *Flores*, at pp. 17−18.)  "*Stamps* concluded that '[n]othing in the language and legislative history of [the ameliorative change in law] suggests an intent to modify section 1192.5's mandate that "the court may not proceed as to the plea other than as specified in the plea" without the consent of the parties.  …  [T]o allow the [trial] court to strike the … enhancement [affected by the change in law] but otherwise retain the plea bargain[] would frustrate the Legislature's intent ….' " (*Flores*, at p. 22, quoting *Stamps*, at p. 704.)  Nevertheless, because the trial court lacked the discretion to strike the five-year enhancement at the time of sentencing, the *Stamps* court concluded that the defendant must be permitted an opportunity to seek the trial court's exercise of its newly granted discretion.  (*Stamps*, at p. 707.)  Although the trial court could not unilaterally modify the plea agreement, if it was inclined to exercise its newly granted discretion, it could withdraw approval for the plea agreement and restore the parties to the status quo ante.  (*Ibid*.)

Finally, in *Flores*, we examined the text, legislative intent, and context of Assembly Bill 1950.  Assembly Bill 1950 was not expressly retroactive to final judgments like the ameliorative change in law at issue in *Harris*.  (*Flores, supra*, 77 Cal.App.5th at pp. 29−30.)  But, given the *Estrada* presumption and the absence of legislative intent to the contrary, it was retroactive to cases not yet final on appeal.[7]  (*Id*. at p. 30.)

---

[7]    The legislative intent behind Assembly Bill 1950 "reflects, at bottom, concern 'that lengthy probationary periods do not serve a rehabilitative function and unfairly lead to reincarceration for technical violations.' " (*Flores, supra*, 77 Cal.App.5th at p. 32.)  The legislation was underpinned by research showing " 'that probation services, such as mental health care and addiction treatment, are most effective during the first 18 months of supervision,' " and " 'that providing increased supervision and services earlier reduces

20.

We explained that the remedy in *Stamps* was not applicable to Assembly Bill 1950 cases because the *Stamps* court "addressed an additional concern not" at issue in *Flores*. (*Flores*, *supra*, 77 Cal.App.5th at p. 36.) The ameliorative change in law in *Stamps* "did not directly modify a term of the parties' plea bargain, unlike Assembly Bill 1950[,]" at issue in *Flores*. (*Flores*, at p. 36.) "Rather, it merely afforded the defendant the opportunity to ask the trial court to exercise" its newly granted discretion to strike the five-year enhancement. (*Ibid.*) "The defendant in *Stamps* sought more than the relief to which he was entitled …; should he succeed in persuading the court to strike the [five-year] enhancement …, he also wanted to maintain the rest of his plea bargain. The effect of this is a request that the trial court modify a term of the plea bargain, unilaterally." (*Flores*, at pp. 36−37.) Assembly Bill 1950 was meaningfully different. "Reduction in the maximum probation term under Assembly Bill 1950 … was effected by the Legislature directly and does not rely upon the trial court's exercise of its sentencing discretion." (*Flores*, at p. 39.) Assembly Bill 1950 prohibited the sentence that was imposed. For that reason, we concluded that the remedy set out in *Stamps*— restoring the parties to the status quo ante with no apparent limitations on the maximum—was not appropriate for modifications required under Assembly Bill 1950. In *Flores*, the relief sought by the defendant was not beyond that which Assembly Bill 1950 afforded—reduction of the term of misdemeanor probation to one year. Because we concluded that the law directly affected a term of the plea agreement and undermined the bargain entirely (the defendant did not "repudiate [his] plea bargain"), depriving

---

an individual's likelihood to recidivate.' " (*Id*. at pp. 32−33.) In *Flores*, we further noted that the majority of criminal cases—probably " 'between 80 and 90 percent of criminal cases are disposed of by guilty pleas …, which, in the majority of cases, are the product of plea bargains.' " (*Id*. at p. 34.) In light of the legislative intent and the fact that most criminal cases are disposed of by plea bargains, we concluded that Assembly Bill 1950 was retroactive to all cases not yet final on appeal. (*Ibid.*)

defendant of the benefit of his plea agreement *and* depriving him of the benefit of Assembly Bill 1950 by restoring the parties to the status quo ante would run afoul of *Harris* and *Collins*. (*Flores*, at pp. 40−41.) Assembly Bill 1950 prohibited the sentence imposed—a term of probation exceeding one year. Placing the defendant in a position where he could face prison based only on his receipt of the direct benefit of an ameliorative change in the law designed to lessen terms of probation would have flown in the face of the legislative intent. We therefore reduced the defendant's term of probation to one year without permitting the trial court or People an opportunity to withdraw approval for the plea agreement.

As discussed above, Senate Bill 567 does not merely grant trial courts new discretion or add additional considerations to the exercise of discretion. Senate Bill 567 limits a trial court's authority and requires it to make a new determination—whether, based on facts proved to a jury (or a court in a bench trial) or admitted by defendant, the "circumstances in aggravation of the crime … justify the imposition of a term of imprisonment exceeding the middle term …."[8] (§ 1170, subd. (b)(2).) That limitation on discretion was a purposeful response by the author of Senate Bill 567 to the previous broad discretion afforded to trial courts in selecting between the lower, middle, and upper

---

[8]     Section 1170, subdivision (b)(1) now provides that "[w]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, *in its sound discretion*, order imposition of a sentence not to exceed the middle term, except" as provided in subdivision (b)(2). (Italics added.) Previously, the trial court had broad discretion to impose the lower, middle, or upper term in the interest of justice. (§ 1170, former subd. (b); California Rules of Court, rule 4.420(e).) Senate Bill 567 permits the trial court discretion to impose a sentence exceeding the middle term only if it makes the required finding; it did not grant discretion—it limited discretion. Without the required finding, the trial court has discretion to impose only the lower or middle term. (See Sen. Com. on Public Safety, Analysis of Sen. Bill 567 (2021−2022 Reg. Sess.) as amended Mar. 9, 2021, p. 4 ["When aggravating factors are not present or not proven, the bill authorizes the court to sentence the defendant to a term not to exceed the middle term meaning that the judge has the discretion to sentence the defendant to a range in between the lower and middle term."].)

terms that has "led to individuals serving maximum prison sentences without the opportunity to effectively refute alleged aggravating facts." (Assem. Com. on Public Safety, Rep. on Sen. Bill 567 (2021−2022 Reg. Sess.) as amended May 20, 2021, p. 3.) Senate Bill 567 reflected the Legislature's intent to ensure that "the harshest sentences receive the greatest scrutiny and justification before they are meted out." (*Ibid*.)

Where, as here, no finding was made that the circumstances in aggravation justify imposition of the upper term, the upper term may not be imposed. The matter must be remanded for the trial court to make the required finding.[9] We take no position on the appropriate finding.

If the trial court does not conclude that the admitted facts support the finding that circumstances in aggravation justify imposition of the upper term, the trial court may not impose the upper term, which wholly undermines the plea agreement. As was the case in *Flores* and *Collins* (and unlike *Stamps*), the undermining of the plea agreement is the direct consequence of the ameliorative change in law; defendant did not repudiate the plea agreement. Unlike *Flores*, the only remedy available under the law is not to reduce the sentence without allowing withdrawal from the plea agreement. As noted in *Flores* and *Collins*, such is a " 'bounty in excess of that to which [defendant] is entitled.' " (*Flores*, *supra*, 77 Cal.App.5th at p. 41; *Collins*, *supra*, 21 Cal.3d at p. 215.) *Collins* is

---

[9]     We are mindful that no facts were proved to a jury and the admitted factual basis for the plea was little more than a recitation of elements of the offense. Defendant could admit a more detailed factual basis, or he could waive his right to a jury trial on the aggravated circumstances finding; or the People could prove facts that they believe support an aggravated circumstances finding to a jury or submit certified records of defendant's prior convictions (see § 1170, subd. (b)(3). If a factual basis for the finding is proved, and the trial court concludes that the circumstances in aggravation justify imposition of the upper term, the plea agreement will not be undermined and the upper term may be imposed, consistent with the plea agreement. However, we offer guidance to the trial court in the event that no finding is made that the circumstances in aggravation support imposition of the upper term.

instructive regarding an appropriate remedy:[10] restore the lost benefit of the bargain to the state by placing the parties in the pre-plea status quo, but preserve the benefit of the bargain to defendant by precluding a total sentence exceeding the sentence stipulated in the plea agreement. (*Collins*, at p. 216.) Such an outcome is consistent with the legislative intent of Senate Bill 567: to ensure that "the harshest sentences receive the greatest scrutiny and justification before they are meted out." (Assem. Com. on Public Safety, Rep. on Sen. Bill 567 (2021−2022 Reg. Sess.) as amended June 28, 2021, p. 3.)

## DISPOSITION

Defendant's sentence is vacated, and the matter is remanded for factfinding and resentencing pursuant to section 1170, subdivision (b). In all other respects, the judgment is affirmed.

---

[10] *Collins* involved reviving only the 14 dismissed counts because the offense of conviction was decriminalized. (*Collins*, *supra*, 21 Cal.3d at p. 211.) Such is not the case here. Setting aside the plea agreement permits the People to prosecute the criminal threats charge as well as the dismissed charges.